# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JERRY T. GRANGER JR.,

        Plaintiff,

        v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,[1]

        Defendant.

No. 15 C 11625

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Jerry T. Granger Jr. filed this action seeking reversal of the final decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act (SSA). 42 U.S.C. §§ 405(g), 423 *et seq*. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a request to reverse the Administrative Law Judge's (ALJ's) decision and remand for additional proceedings. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

---

[1] On January 23, 2017, Nancy A. Berryhill became Acting Commissioner of Social Security and is substituted for her predecessor as the proper defendant in this action. Fed. R. Civ. P. 25(d).

# I. THE SEQUENTIAL EVALUATION PROCESS

To recover DIB or SSI, a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F.Supp.2d 973, 976–77 (N.D. Ill. 2001).[2] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985).

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The SSI regulations are set forth at 20 C.F.R. § 416.901 et seq. The standards for determining DIB and SSI are virtually identical. *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

"The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on December 29, 2011, alleging that he became disabled on April 20, 2010, because of Guillain-Barré syndrome (GBS)[3] and chronic inflammatory demyelinating polyneuropathy (CIDP).[4] (R. at 96, 106, 118, 129). The applications were denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 116–17, 140–41, 165–67). On October 23, 2013, Plaintiff, represented by counsel, testified at a hearing before an ALJ. (*Id.* at 50-95). The ALJ also heard testimony from Ashok Jilhewar, M.D., a medical expert (ME), Michael Cremerius, Ph.D., a psychological expert, and Brian Harmon, a vocational expert (VE). (*Id.*).

The ALJ denied Plaintiff's request for benefits on April 25, 2014. (R. at 14–45). Applying the five-step sequential evaluation process, the ALJ found, at step one, that there is conflicting evidence whether Plaintiff had engaged in substantial gainful activity since April 20, 2010, his alleged onset date. (*Id.* at 20–22). However, after evaluating the evidence, including Plaintiff's testimony, the ALJ determined that there is no evidence that Plaintiff worked after December 2011. (*Id.* at 21). At

---

[3] GBS is a "disorder in which the body's immune system attacks part of the peripheral nervous system." *Hirmiz v. Sec'y of Health & Human Servs.*, 119 Fed. Cl. 209, 219 n.10 (2014), *aff'd*, 618 F. App'x 1033 (Fed. Cir. 2015).

[4] CIDP is a "neurological disorder characterized by progressive weakness and impaired sensory function in the arms and legs. This condition is often considered the chronic counterpart to the acute Guillain-Barré syndrome." *Hirmiz*, 119 Fed. Cl. at 219 n.10.

step two, the ALJ found that Plaintiff's GBS and hepatitis B infection are severe impairments. (*Id*. at 22–26). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equals the severity of any of the listings enumerated in the regulations. (*Id*. at 26–27).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[5] and determined that Plaintiff can perform a full range of sedentary work. (R. at 27–43). At step four, the ALJ found that Plaintiff is unable to perform any past relevant work. (*Id*. at 43). Based on Plaintiff's RFC, age, education, and the VE's testimony, the ALJ determined at step five that there are semi-skilled and unskilled jobs that exist in significant numbers in the national economy that Plaintiff can perform, including personnel clerk, telephone solicitor, receptionist, surveillance system monitor, bonder, and charge account clerk. (*Id*. at 44). Accordingly, the ALJ concluded that Plaintiff is not suffering from a disability, as defined by the Act. (*Id*.).

The Appeals Council denied Plaintiff's request for review on October 19, 2015. (R. at 1–5). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

---

[5]Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675-76.

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is

weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

Plaintiff was diagnosed with hepatitis B with liver fibrosis in 2009 and began therapy thereafter. (R. at 416). On April 21, 2010 Plaintiff was hospitalized at Loyola University Medical Center with a one-week history of progressive weakness that started in his lower extremities and progressed to his upper extremities with paresthesias of his toes and fingers. (*Id.* at 505). On admission, Plaintiff showed 4/5 upper extremity strength and 3/5 lower extremity strength. (*Id.*). Plaintiff was unable to walk but had normal cognition and cranial nerves. (*Id.*). On April 22, 2010, Matthew McCoyd, M.D., performed an electromyography (EMG) which was abnormal and revealed evidence of a non-length-dependent axonal neuropathy affecting motor fibers. (*Id.* at 866). Plaintiff was diagnosed with GBS and acute hepatitis B and received five days of intravenous immunoglobulin therapy (IVIG). (*Id.* at 505–06).

Plaintiff was discharged on April 26, 2010, and transferred to inpatient rehabilitation. (R. at 499). Upon discharge, Plaintiff demonstrated improved strength in his upper and lower extremities and some return of muscle stretch reflexes in his upper

and lower extremities. (*Id*. at 501). Plaintiff remained at the inpatient rehabilitation facility through May 20, 2010. (*Id*. at 503). Plaintiff was then discharged to home with instructions to follow up with his primary care provider, a neurologist, and a hepatologist for his hepatitis B with transaminitis. (*Id*.).

On June 4, 2010, Plaintiff was examined by Claus J. Fimmel, M.D. (R. at 420–21, 721–29). At that time, Plaintiff had marked residual paralysis and could not walk. (*Id*. at 420, 725). Dr. Fimmel noted that a liver biopsy would be useful in assessing the extent and possible chronicity of Plaintiff's hepatitis B infection, but Plaintiff was unwilling to undergo a diagnostic liver biopsy. (*Id*. at 421, 725–26). Dr. Fimmel recommended starting Plaintiff on Entecavir (antiviral) once his repeat virological studies were back. (*Id*. at 421, 726).

Plaintiff was seen by Michael J. Schneck, M.D., on June 24, 2010, complaining of worsening double vision, left arm weakness, and difficulty ambulating with worsening symptoms over the past several days. (R. at 420). Dr. Schneck readmitted Plaintiff to Loyola University Medical Center hospital for a repeat lumbar puncture, EMG, rehab assessment, and possible pheresis/IVIG or steroids depending on the findings of a diagnostic workup. (*Id*.). Upon readmission, Plaintiff had marked motor weakness, areflexia (below normal or absent reflexes), and bilateral facial muscle weakness. (R. at 437). An EMG showed marked deterioration compared to the April 22, 2010 EMG. (*Id*.). The June 24, 2010 EMG continued to show evidence of demyelination but was accompanied by significant axonal injury, worse distally in the limbs and involving sensory as well as motor axons. (*Id*.). A liver biopsy showed

severe autoimmune inflammation. (*Id*. at 437, 491). Plaintiff started Entecavir and prednisone (steroid) 80 mg daily. (*Id*.). Plaintiff also received five days of IVIG. (*Id*.). Dr. Danilo Vitorovic, M.D., stated that Plaintiff's clinical picture was most consistent with CIDP. (*Id*.). Plaintiff was discharged to the Rehabilitation Institute of Chicago (RIC) on July 2, 2010. (*Id*. at 440). Upon discharge, Plaintiff's medical condition was "fair." (*Id*. at 437). Plaintiff had severe bilateral left extremity weakness with pain as well as left upper extremity weakness, but his left upper extremity weakness was improving. (*Id*.).

Between July 2 and August 12, 2010, Plaintiff participated in physical therapy, occupational therapy, and rehabilitation at the RIC. (R. at 594–711). Upon admission, Plaintiff was unable to ambulate. (*Id*. at 705). Prior to discharge, Plaintiff was able to ambulate 400 feet and climb 20 stairs. (*Id*.). In terms of transfers, Plaintiff was "total assist" upon admission and became "modified independent" prior to discharge. (*Id*.).

At Plaintiff's follow-up visit on July 23, 2010, with Dr. McCoyd, Plaintiff reported some recent improvement in his symptoms but he was not back to his pre-April baseline. (R. at 416). Plaintiff's motor examination showed left deltoid and biceps weakness at 4/5. (*Id*. at 417). His upper and lower extremity reflexes were absent. (*Id*.). Plaintiff's gait and station were normal. (*Id*) Dr. McCoyd stated that the clinical and electrophysiologic picture seemed most consistent with a diagnosis of CIDP. (*Id*.). Dr. McCoyd recommended continued treatment with maintenance on oral

steroids at Plaintiff's current dose (80 mg per day) and monthly IVIG therapy. (*Id.* at 418-19).

At a follow-up on August 18, 2010, with Dr. Fimmel, Plaintiff was walking with a walker but no other assistance. (R. at 409, 734). He was able to move around freely with full or near-full use of his upper and lower extremities. (*Id.*). Plaintiff reported that he was about to finish his formal outpatient physical therapy and was eager to return to work. (*Id.*). Plaintiff's physical examination was normal. (*Id.* at 411, 735). Dr. Fimmel noted that Plaintiff had dramatically improved from a neurological standpoint from July 2, 2010, when he was not able to walk or provide any meaningful help to being positioned on the examination table. (*Id.* at 412, 737). Dr. Fimmel further noted that Plaintiff had a concomitant, marked improvement in his liver enzymes on Entecavir and prednisone. (*Id.*). Dr. Fimmel indicated that in hindsight, he suspected that Plaintiff's "autoimmune-like" changes on his liver biopsy may have been due to a flare up of his hepatitis B reactivation. (*Id.*). Dr. Fimmel recommended discontinuing immunosuppression therapy and instead continuing Entecavir monotherapy. (*Id.* at 412-13, 737). He directed Plaintiff to continue Entecavir indefinitely, decrease prednisone from 80 mg to 40 mg per day, and return in six weeks. (*Id.* at 413, 737–38).

On September 10, 2010, Plaintiff had a follow-up visit with Dr. McCoyd for weakness related to his inflammatory neuropathy. (R. at 407–09). Plaintiff reported feeling 75% better compared to April 2010, but he still had some pain in his feet. (*Id.* at 408). On motor examination, Plaintiff's strength was improved versus his

previous exam with mild weakness of right knee flexion and extension. (*Id.*). Plaintiff's reflexes were 1+ in the left bicep. (*Id.*). Plaintiff's gait was slow but he was able to walk without assistance. (*Id.*). He could take a few steps on his tiptoes and heels. (*Id.*). Dr. McCoyd planned to continue to slowly wean Plaintiff off of steroids and maybe transition to Azathioprine (immunosuppressant), continue IVIG treatment, continue rehabilitation, and continue Neurontin (pain medication). (*Id.* at 408–09). Dr. McCoyd opined that Plaintiff's inflammatory neuropathy had led to symptoms of muscle weakness which as an ongoing process that may have relapses and remissions. (*Id.* at 870).

Plaintiff returned to Dr. Fimmel on September 29, 2010 for a follow-up visit on his chronic hepatitis B infection. (R. at 402–07, 742–51). Dr. Fimmel noted that Plaintiff was improving on 50 mg of prednisone and 1 mg per day of Entecavir. (*Id.* at 402, 743). Plaintiff was enrolled in daily rehabilitation and was targeting a January 2011 possible return-to-work date. (*Id.*). Plaintiff's physical exam was normal with full range of motion, no atrophy, and normal strength in his extremities. (*Id.* at 404, 744). Plaintiff showed excellent virological response to Entecavir with a decrease in viral load by at least six orders of magnitude and near-normalization of liver enzymes. (*Id.* at 407, 748). Plaintiff had improved neurologically as well but was still on a fairly high dose of prednisone. (*Id.*). Dr. Fimmel directed Plaintiff to stay on Entecavir indefinitely and return in two to three months to repeat labs. (*Id.*).

On December 17, 2010, Plaintiff was examined by Dr. Fimmel at a follow-up visit for his hepatitis B infection. (R. at 399–400, 752–60). Plaintiff stated that his overall strength had returned to 75% of his normal baseline. (*Id*. at 399, 756). He reported difficulties concentrating and increased fatigue at work and in class. (*Id*.). Plaintiff had not resumed full-time work and was concerned about his weight gain and moon face. (*Id*.). Dr. Fimmel's impression was improved hepatitis B infection and neurological status on Entecavir 1 mg per day and prednisone 30 mg per day. (*Id*. at 400, 755). Dr. Fimmel referred Plaintiff to neurology for a follow-up and a decision regarding whether to start Plaintiff on Azathioprine. (*Id*.). Plaintiff was directed to follow-up with Dr. Fimmel in three months and continue Entecavir indefinitely. (*Id*. at 400, 758).

On January 3, 2011, Plaintiff returned to Dr. McCoyd for a follow-up appointment. (R. at 396). Dr. McCoyd noted that there had been gradual improvement in Plaintiff's symptoms but he had not completely returned to his baseline. (*Id*.). Plaintiff reported some residual back pain and distal paresthesias. (*Id*.). Plaintiff had been weaning off of prednisone and was currently taking 20 mg daily. (*Id*. at 396-97). Plaintiff's general physical examination was normal. (*Id*. at 398). Plaintiff's motor examination was normal other than mild distal weakness. (*Id*.).The reflex examination showed ankle reflexes present, toes were downgoing, patellae and upper extremity reflexes were relatively reduced. (*Id*.). The Romberg test was negative. (*Id*.). Plaintiff was able to walk under his own power and stand on his tiptoes but had some difficulty standing on his right heel. (*Id*) Dr. McCoyd noted that there had

been improvement in Plaintiff's physical examination but there were still some residual symptoms. (*Id*. at 399). He planned to continue to wean Plaintiff off prednisone and decrease Neurontin after prednisone was stopped. (*Id*.).

In a February 3, 2011 letter addressed "To Whom It May Concern," Dr. McCoyd wrote that Plaintiff had been evaluated and treated for an inflammatory peripheral neuropathy and could return to work with no specific restrictions. (R. at 872). At a March 9, 2011 follow-up appointment with Dr. McCoyd, Plaintiff complained of back pain, needing to rest when he walks, and fatigue during the day especially after activity. (*Id*. at 393). Plaintiff's last day on steroids was March 6, 2011. (*Id*.). Plaintiff's general physical examination was normal. (*Id*. at 395). His motor examination revealed normal bulk and tone of the upper and lower extremities, no definite atrophy and no fasciculations, strength 5/5 in all muscles tested, and distal weakness seemed improved since his previous examination. (*Id*.). On reflex examination, Plaintiff's ankle reflexes were present, toes were downgoing, patellae reflexes were present but relatively reduced compared to the ankles, biceps reflexes were present. (*Id*.). Plaintiff was able to walk under his own power but had some difficulty standing on his heels. (*Id*.). He could stand on his tiptoes but had some difficulty with tandem walking. (*Id*.). Dr. McCoyd noted that Plaintiff was off of steroids and showed no evidence of clinical regression. (*Id*. at 396). He indicated that Plaintiff still had residual fatigue with activity that would interfere with his ability to work. (*Id*.). Dr. McCoyd continued Plaintiff on Neurontin. (*Id*.).

Plaintiff saw Dr. Fimmel for a follow-up on his hepatitis B infection on March 16, 2011. (R. at 389–93, 761–70). Plaintiff reported that he was off prednisone and felt well. (*Id*. at 389, 763). Plaintiff stated that his overall strength had returned to 75% of his normal baseline. He reported difficulties concentrating and increased fatigue at work and in class. (*Id*.). Plaintiff's physical examination was normal including full range of motion, no atrophy, and normal strength in his extremities. (*Id*. at 391, 764). Dr. Fimmel's assessment was chronic hepatitis B infection with advanced fibrosis on liver biopsy. (*Id*. at 393, 767). Dr. Fimmel noted that Plaintiff had a good virological response with Entecavir. (*Id*.). The virus was undetectable and Plaintiff had near-normal transaminases levels. (*Id*.). Dr. Fimmel further noted that it was likely that Plaintiff's neurological syndrome was triggered by or related to his hepatitis B infection. (*Id*.). Dr. Fimmel indicated that Plaintiff will need lifelong hepatitis B antiviral treatment given his fibrosis. (*Id*.). Dr. Fimmel recommended a repeat livery biopsy in the future and directed Plaintiff to return in six months. (*Id*.).

The following month, on April 5, 2011, Dr. McCoyd prepared a second "To Whom It May Concern" letter, stating that Plaintiff could return to work and that he would continue to evaluate and treat Plaintiff as medically appropriate. (R. at 873). On June 8, 2011, Dr. Michael P. Merchut, M.D., performed an EMG which revealed mild residual abnormalities reflecting a predominantly motor demyelinating polyneuropathy. (*Id*. at 432). The results of the June 8, 2011 EMG resembled the results of the EMG done on April 22, 2010, and were markedly better than the worst EMG

of June 25, 2010, where axonal loss and acute denervation of sensory and motor nerve fibers were seen. (*Id*.).

In a "To Whom It May Concern" letter dated June 15, 2011, Dr. McCoyd stated that Plaintiff was unable to work due to worsening of his condition from May 5, 2011, through the present time. (R. at 874). Dr. McCoyd wrote: "At this time, in my professional opinion, Mr. Granger can return to work with the following restrictions: he should not work more than two 4-hour days per week." (*Id*).

At a July 8, 2011 follow-up appointment with Dr. McCoyd, Plaintiff complained of problems with his memory and bouts of anxiety. (R. at 386–87, 804). Plaintiff's memory and cognition were significantly interfering with his daily activities. (*Id*. at 387, 804). Plaintiff also reported that he had back pain and worsened weakness since he was last seen. (*Id*.). Plaintiff had tried to return to work but experienced significant symptoms of fatigue and weakness which necessitated a repeat EMG/NCS. (*Id*.). Plaintiff reported fatigue and hair loss. (*Id*. at 388, 805). Plaintiff's general physical examination was normal. (*Id*. at 388, 805–06). On motor and reflex examinations, Dr. McCoyd noted normal bulk and tone of the upper and lower extremities, mild distal weakness, and ankle reflexes present. (*Id*. at 388, 806). As to gait and station, Dr. McCoyd stated that Plaintiff's erect posture was normal, there was no postural instability, no festination, and tandem, heel and toe walking were unremarkable. (*Id*.). Dr. McCoyd assessed cognitive dysfunction significantly interfering with daily activities of unclear etiology. (*Id*. at 389, 806). Dr. McCoyd ordered a formal neuropsychological evaluation. (*Id*.). Dr. McCoyd thought Plaintiff's hair

loss, fatigue, and skin changes might be related to Entecavir and directed Plaintiff to follow-up with a dermatologist. (*Id*.).

On October 7, 2011, Plaintiff saw Dr. McCoyd for a neurology follow-up. (R. at 382–84, 813–17). Plaintiff complained of numbness in his feet with symptoms fluctuating but always present to some extent. (*Id*. at 383, 814). Plaintiff stated that the numbness in his arms was more transient. (*Id*.). Plaintiff also stated that he gets fatigued when walking, usually within one block. (*Id*.). Plaintiff could not run. (*Id*.). Plaintiff's motor and reflex examination revealed normal bulk and tone of the upper and lower extremities, mild distal weakness, ankle reflexes present, patellae and triceps reflexes were reduced, and biceps reflexes were present but reduced. (*Id*. at 384, 815–16). Plaintiff had some difficulty walking on toes, heels and tandem. (*Id*. at 384, 816). Dr. McCoyd concluded that Plaintiff was still with persistent mostly sensory symptoms (numbness) but his pain was reasonably controlled. (*Id*.). Dr. McCoyd noted that Plaintiff did limited walking and had limited strength. (*Id*.). Dr. McCoyd reduced Plaintiff's Neurontin to 600 mg at nighttime and 300 mg every morning. (*Id*.).

Plaintiff was examined by Dr. Minh Nguyen at the Loyola Hepatology Clinic on October 19, 2011. (R. at 378–82, 776–86, 818–25). Dr. Nguyen noted that Plaintiff continued to do well. (*Id*. at 378, 778, 819). Plaintiff was working with neurology on memory issues but otherwise had no complaints. (*Id*.). On physical examination, Plaintiff had full range of motion, no atrophy, and normal strength in all extremities. (*Id*. at 380, 780, 820). Dr. Mihn noted that Plaintiff continued to have good vi-

rological response with Entecavir, the virus was undetectable, and Plaintiff had normal liver transaminase levels. (*Id*. at 382, 782, 823). Dr. Mihn advised Plaintiff to continue lifelong treatment with Entecavir but possibly reduce the dose from 1 mg per day to 0.5 mg per day. (*Id*.).

At a January 9, 2012 follow-up appointment with Dr. McCoyd, Plaintiff complained of significant fatigue that was worse with activity. (R. at 377, 826). Plaintiff stated that he still had some problems with walking at times. (*Id*.). His feet were numb with temperature sensation difficulty. (*Id*.). He also had paresthesias in his feet. (*Id*.). Plaintiff was taking Neurontin 900 mg two times a day which was somewhat helpful in alleviating his symptoms. (*Id*.). On motor and reflex examinations, Plaintiff had normal bulk and tone of the upper and lower extremities, mild distal weakness on toe extension, ankle reflexes present, patellae reflexes were present but reduced compared to ankles, and biceps reflexes were present but reduced. (*Id*. at 377, 827). Plaintiff exhibited some difficulty walking on toes, heels and tandem. (*Id*.). Dr. McCoyd concluded that Plaintiff was clinically stable neurologically but he still had fatigue and mild distal weakness. (*Id*.). He continued Plaintiff on Neurontin for his neuropathic symptoms. (*Id*.).

That same day, Plaintiff returned to Dr. Fimmel for a follow-up regarding his chronic hepatitis B infection. (R. at 377–78). Dr. Fimmel noted that Plaintiff was on long-term Entecavir with excellent virologic and biochemical response. (*Id*. at 378). Dr. Fimmel also indicated that Plaintiff was under unusual psychological stress that was partially work-related. (*Id*.). Dr. Fimmel reduced Plaintiff's Entecavir pre-

scription to 0.5 mg per day and directed him to continue Entecavir indefinitely. (*Id*). Plaintiff was advised to return for a follow-up in six months. (*Id*.).

On January 20, 2012, Dr. McCoyd completed an Attending Physician's Statement of Continued Disability for Hartford Insurance Company based on his most recent clinical assessment. (R. at 843–44). Dr. McCoyd diagnosed CIDP and noted that Plaintiff's subjective symptoms included weakness, fatigue, and imbalance. (*Id*. at 844). Dr. McCoyd's current physical examination findings revealed reduced reflexes and gait dysfunction. (*Id*.). Plaintiff was taking Neurotin 900 mg twice daily. (*Id*.). Dr. McCoyd opined that Plaintiff can sit 2–4 hours at a time for a total of 6–8 hours in a day, stand up to one hour at a time for a total of 2–4 hours in a day, and walk up to ½ hour at a time for a total of 1–2 hours in a day. (*Id*. at 843). Plaintiff can occasionally lift/carry up to 10 pounds and reach occasionally above shoulder, at waist/desk level, and below waist/desk level. (*Id*.). Dr. McCoyd indicated that it was unclear the expected duration of Plaintiff's restrictions. (*Id*.). Dr. McCoyd concluded that Plaintiff did not have a psychiatric/cognitive impairment. (*Id*.).

On March 7, 2012, Mark B. Langgut, Ph.D., a clinical psychologist, conducted a psychological consultative examination. (R. at 712–16). Dr. Langgut observed that Plaintiff had a laconic presentation, with significant difficulty with attention, memory, and focus. (*Id*. at 712). Plaintiff laughed at questions and provided incomplete responses. (*Id*.). Plaintiff had difficulty providing basic information, such as his age. (*Id*.). Dr. Langgut noted that Plaintiff was slow-moving and unhurried, appearing tired and fatigued. (*Id*.). He ambulated independently and his gait was un-

impaired. (*Id*. at 712, 714). During the evaluation of Plaintiff's mental capacity, Plaintiff exerted good effort. (*Id*. at 714). Plaintiff demonstrated intact short-term and long-term memory functioning and an adequate general fund of information. (*Id*). He performed calculations with average speed. (*Id*.). Dr. Langgut observed that Plaintiff presented with a high level of concretively of thought that was inconsistent with his education level. (*Id*.). Dr. Langgut opined that Plaintiff may have significant difficulty with forming generalizations and understanding concepts, and he may become frustrated when faced with these types of tasks. (*Id*.). Plaintiff's responses indicated that he had intact judgment. (*Id*. at 714-15). Dr. Langgut noted that Plaintiff's thought processes were characterized by slow speed, average coherence, and normal flexibility and suggestibility. (*Id*. at 715). Plaintiff had a mild degree of ruminative ideation. (*Id*.). Dr. Langgut concluded that Plaintiff demonstrated adequate judgment, responsibility, and arithmetic reasoning skills, as well as an ability to understand the effects of his actions on himself and others. (*Id*.). Dr. Langgut diagnosed dysthymic disorder.[6] (*Id*.).

At a March 19, 2012 follow-up for his inflammatory neuropathy with Dr. McCoyd, Plaintiff reported pain and weakness that prevented him from working a full schedule. (R. at 829). Plaintiff was able to walk a few blocks but developed left extremity pain after walking. (*Id*.). Plaintiff had chronic low back pain. (*Id*) Plaintiff indicated that he tried to return to work and was able to work for a short period of time. (*Id*.). Plaintiff also reported continued problems with memory and cognition

---

[6] Dysthymic disorder is a mild but chronic form of depression. *Mangan v. Colvin*, 2015 WL 9450616, at *3 n.4 (N.D. Ill. Dec. 22, 2015).

and some anxiety. (*Id.*). Plaintiff's motor examination revealed normal bulk and tone of the upper and lower extremities. (*Id.* at 830). Plaintiff had mild distal weakness on toe extension. (*Id.*). On Plaintiff's reflex examination, Plaintiff's ankle reflexes were present, patellae reflexes were present but reduced compared to the ankles, and biceps were present but reduced. (*Id.*). Plaintiff had some difficulty walking on toes, heels and tandem. (*Id.*). Dr. McCoyd found that Plaintiff still had residual unresolved neurologic symptoms, including distal pain and mild weakness (*Id.*). Dr. McCoyd noted that Plaintiff had attempted to return to work but could not tolerate a full day due to weakness, fatigue, and pain. (*Id.*). He opined that Plaintiff's symptoms were likely the result of his underlying neurologic condition. (*Id.*). Based on these symptoms, Dr. McCoyd stated that Plaintiff would "need accommodation for school and work (*i.e.*, increased time for tests)." (*Id.*). That day, Dr. McCoyd wrote another "To Whom It May Concern" letter indicating that Plaintiff "requires accommodation for school work due to his neurologic condition." (*Id.* at 875).

On April 3, 2012, Terry A. Travis, M.D., a state agency consultant, reviewed the medical record and completed a mental residual functional capacity assessment. (R. at 103–04, 113–14). Dr. Terry found that Plaintiff has affective disorders. (*Id.* at 99, 109). He opined that Plaintiff has mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (*Id.*). Dr. Travis also found that Plaintiff had understanding and memory limitations but was able to relate appropriately, adapt to circumstances, learn instructions, function consistently at a reasonable rate with-

in a schedule, and do one-two step tasks in a routine work setting. (*Id.* at 100, 103-04, 110, 113-14). On reconsideration, Donald Cochran, Ph.D., a state agency consultant, affirmed Dr. Terry's assessment except that Dr. Cochran found Plaintiff moderately limited in his ability to understand and remember detailed instructions while Dr. Terry found no significant limitation in this area. (*Id.* at 103, 113, 126, 137).

On April 10, 2012, Bharati Jhaveri, M.D., a state agency consultant, reviewed the medical record and completed a physical residual functional capacity assessment. (R. at 101–03, 111–13). She opined that Plaintiff can occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, and stand, walk, or sit about six hours in an eight-hour workday. (*Id.* at 101, 111). Dr. Jhaveri further opined that Plaintiff can frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, occasionally climb ladders, ropes, and scaffolds, and should avoid concentrated exposure to extreme cold and heat, humidity, vibration, and hazards. (*Id.* at 102, 112). On September 9, 2012, Reynaldo Gotanco, M.D., another state agency consultant, affirmed Dr. Jhaveri's assessment with one exception—Dr. Gotanco found that Plaintiff can stand and/or walk a total of two hours in an eight-hour workday rather than the six hours found earlier. (*Id.* at 123-25, 134-36).

Plaintiff saw Marla Wolfert, M.D., a gastroenterologist, for his hepatitis B on April 18, 2012. (R. at 786–96, 833–39). Dr. Wolfert noted that Plaintiff was doing well with no complaints related to his liver disease. (*Id.* at 788, 834). Dr. Wolfert indicated that Plaintiff still had chronic fatigue and had not returned to work because

of the fatigue. (*Id.*). On examination, Plaintiff was pain free, with normal gait, muscle strength, and tone. (*Id.* at 790, 835). Dr. Wolfert stated that Plaintiff was doing well on Entecavir and his HBV DNA level was below the limit of quantification, his HBeAb was now positive, and his HBeAg negative. (*Id.* at 792, 837). Dr. Wolfert directed Plaintiff to continue Entecavir and follow-up in six months with labs and an ultrasound. (*Id.*).

On April 30, 2012, Plaintiff had a follow-up appointment with Dr. McCoyd for his inflammatory neuropathy. (R. at 840–42, 865). Dr. McCoyd noted that Plaintiff had tried to return to work but was limited by fatigue and weakness. (*Id.*) Plaintiff reported that he had a limited amount of time in which he could engage in activity. (*Id.*). Upon examination, Plaintiff had normal bulk and tone of the upper and lower extremities, mild distal weakness on toe extension, ankle reflexes were present, patellae reflexes were present but reduced compared to the ankles, and biceps reflexes were present but reduced. (*Id.* at 841). Plaintiff had some difficulty walking on toes, heels and tandem. (*Id.*). Dr. McCoyd indicated that Plaintiff had attempted to return to work but was not able to complete a work day due to fatigue and weakness. (*Id.*). Dr. McCoyd opined that if Plaintiff's fatigue and weakness symptoms persisted, he may need a repeat EMG/NCS and/or cerebrospinal fluid (CSF) analysis.

On June 12, 2012, Dr. McCoyd signed a "To Whom It May Concern" letter in which he stated that Plaintiff had been diagnosed with an inflammatory peripheral neuropathy based on clinical and ancillary studies. (R. at 717). Dr. McCoyd opined that Plaintiff was unable to work full-time. (*Id.*). He noted that Plaintiff attempted

to return to full-time work but was limited due to his neurologic condition. (*Id*.). Dr. McCoyd further concluded that Plaintiff is able to work part-time (4–8 hours per day, 2 days per week). (*Id*.).

On August 14, 2012, Plaintiff underwent an outpatient physical therapy evaluation at Loyola Rehabilitation Services. (R. at 983–91). Plaintiff's chief complaint was lower back pain and right-sided neck pain. (*Id*. at 984). Plaintiff also complained of generalized fatigue and weakness with limited endurance. (*Id*.). The physical therapist observed that Plaintiff had a gait abnormality and weakness. (*Id*. at 989-990). The physical therapist also noted that Plaintiff's functional limitations included being unable walk, stand, or sit more than 10–15 minutes without pain or fatigue. (*Id*. at 990). She recommended physical therapy two times a week for 10 weeks with the goals of Plaintiff getting stronger and decreasing pain, Plaintiff being independent with home exercise program upon the completion of therapy, Plaintiff reporting lower back pain of no greater than 1/10 on the pain scale with aggravating factors, and Plaintiff demonstrating bilateral lower and upper extremity strength of at least 4+/5. (*Id*.). Between August 16, 2012 and October 23, 2012, Plaintiff attended 14 physical therapy sessions. (*Id*. at 993–1050).

On August 27, 2012, Plaintiff returned to Dr. McCoyd for a follow-up appointment. (R. at 856–64). Plaintiff reported frequent fatigue in the morning, persistent weakness, being able to walk about 50–100 feet, and temperature extremes bothersome especially to his feet. (*Id*. at 856, 861). In his review of systems, Dr. McCoyd noted that Plaintiff reported significant fatigue and problems with memory and

concentration. (*Id*. at 858, 862). Plaintiff had normal bulk and tone of the upper and lower extremities. (*Id*. at 858, 863). Dr. McCoyd noted mild distal weakness on toe extension. (*Id*.). On Plaintiff's reflex examination, ankle reflexes were present, patellae reflexes were present but reduced compared to the ankles, and biceps reflexes were present but reduced. (*Id*.). Plaintiff had some difficulty walking on toes, heels and tandem. (*Id*.). Dr. McCoyd noted that Plaintiff will need continued close follow-up to evaluate for evidence of neurologic deterioration or inflammatory relapse. (*Id*. at 860, 864). If there is a worsening of symptoms and correlated findings on EMG, Dr. McCoyd stated that Plaintiff would likely need to resume corticosteroids or IVIG therapy. (*Id*.).

On May 7, 2013, Dr. Scott Cotler, a Loyola hepatologist, examined Plaintiff. (R. at 878–87). Plaintiff complained of fatigue and weakness as well as tingling and numbness in his hands and feet. (*Id*. at 881). Plaintiff stated that he did not feel as if his symptoms had improved with treatment of his hepatitis B. (*Id*.). Plaintiff reported that he was taking Entecavir on an empty stomach and missed about two doses per month. (*Id*.). A review of systems was positive for polyneuropathy, weakness, tingling in his hands and feet with numbness, weight stable, back pain, hair loss, and fatigue. (*Id*. at 882). Dr. Cotler noted that Plaintiff had detectable, but not quantifiable virus levels. (*Id*. at 883). Dr. Cotler discussed the importance of Plaintiff taking his dose of Entecavir every day on an empty stomach. (*Id*.). Dr. Cotler directed Plaintiff to return in three months, obtain a liver ultrasound, and continue to follow-up with neurology for his neuropathy. (*Id*.). A liver ultrasound on August 7,

2013 revealed no focal hepatic abnormality, echogenicity and size within normal limits, and stable gallbladder polyps. (*Id*. at 887–88).

Plaintiff presented to Dr. McCoyd for a follow-up on June 10, 2013. (R. at 922–27). Plaintiff reported a fall of about 9–10 feet in March 2013. (*Id*. at 923). Plaintiff had immediate low back pain and chronic low back pain since that time. (*Id*.). Plaintiff reported no changes in walking, no new bladder symptoms, no muscle loss, no new numbness in his legs, and no major changes in fatigue and cognition. (*Id*.). Plaintiff had sustained distal numbness in his feet and hands. (*Id*.). On examination, Dr. McCoyd noted that Plaintiff had normal bulk and tone of the upper and lower extremities, mild distal weakness on toe extension, ankle reflexes present, patellae reflexes were present but reduced compared to the ankles, and biceps reflexes were present but reduced. (*Id*.). Plaintiff had some difficulty walking on toes, heels and tandem. (*Id*.). Dr. McCoyd recommend simple analgesics for Plaintiff's back pain. (*Id*.). As to Plaintiff's GBS, Dr. McCoyd noted that Plaintiff still suffered exertional fatigue and opined that Plaintiff's symptoms were likely chronic and permanent. (*Id*.).

Plaintiff returned to see Dr. Cotler on August 13, 2013. (R. at 974–83). Plaintiff stated that he occasionally missed doses of his Entecavir due to memory lapses. (*Id*. at 974). Plaintiff reported no fatigue and no weakness but was having tingling in his hands and feet. (*Id*. at 975). Plaintiff had 4/5 muscle strength in his upper and lower extremities. (*Id*). Dr. Cotler noted that Plaintiff has had detectable, but not quantifiable virus levels. (*Id*.). Plaintiff had not achieved 100% adherence with his

medication. (*Id*.).Dr. Cotler increased Plaintiff's dose of Entecavir from 0.5 mg daily to 1 mg daily and directed Plaintiff to return in six months and follow-up with neurology for his neuropathy. (*Id*.).

Dr. McCoyd completed a Physical Residual Functional Capacity Questionnaire on August 30, 2013. (R. at 1051–55). Dr. McCoyd diagnosed inflammatory demyelinating polyneuropathy with a prognosis of "variable course" and his symptoms as fatigue, weakness, imbalance, and numbness. (*Id*. at 1051). Dr. McCoyd stated that Plaintiff has back pain which is exacerbated by activity. (*Id*.). The clinical findings and objective signs Dr. McCoyd cited included EMG/NCS with evidence of demyelination, elevated CSF protein, and reduced reflexes. (*Id*.). Dr. McCoyd concluded that Plaintiff's impairments had lasted or could be expected to last at least 12 months. (*Id*.)Dr. McCoyd indicated that emotional factors do not contribute to the severity of Plaintiff's symptoms and functional limitations. (*Id*. at 1052). Dr. McCoyd further indicated that Plaintiff's impairments were reasonably consistent with his symptoms and functional limitations. (*Id*.).

Dr. McCoyd opined that Plaintiff is incapable of even a low stress job because of his significant fatigue with activity. (R. at 1052). With respect to Plaintiff's functional limitations, Dr. McCoyd stated that Plaintiff can occasionally lift and carry less than 10 pounds; rarely lift and carry 20 pounds; walk 1–2 city blocks without rest or severe pain; sit for one hour at a time; stand for 20 minutes at a time, sit for about four hours in an eight-hour workday; stand/walk about two hours in an eight-hour workday; occasionally look down, turn head right or left, look up, and hold his

head in a static position; occasionally twist, stoop, crouch/squat, and climb stairs; and rarely climb ladders. (*Id*. at 1052–54). Dr. McCoyd opined that Plaintiff needs a job that permits shifting positions at will from sitting, standing, or walking. (*Id*. at 1053). Plaintiff would sometimes need to take unscheduled breaks during an eight-hour workday due to variable back pain. (*Id*.). Dr. McCoyd found no significant limitations with reaching, handling, and fingering. (*Id*. at 1054). He opined that Plaintiff can grasp with his hands and perform fine manipulations with his fingers 80% of the workday and reach with his arms 50% of the workday. (*Id*.). According to Dr. McCoyd, Plaintiff is likely to have good days and bad days, and to be absent from work more than four days per month. (*Id*.).

At the hearing on October 23, 2013, Plaintiff testified that he experiences numbness and tingling in his hands and feet, cold feet, back pain, fatigue, memory loss, and occasional irritability. (R. at 72–73, 81). His back pain is sharp and the numbness and tingling in his hands and feet comes and goes. (*Id*. at 80–81). Prolonged activity like walking three blocks, driving more than 20 minutes, or talking a lot aggravate his symptoms. (*Id*. at 75). Plaintiff sometimes forgets to take his medication. (*Id*. at 76-77). Plaintiff reported that his medications have been effective in controlling his symptoms. (*Id*. at 78). He could not differentiate whether his fatigue was caused by impairments or by medication side effects. (*Id*.). To alleviate his symptoms, Plaintiff takes his medications, stretches, walks, takes naps, and avoids stressful situations. (*Id*. at 78–79). He sleeps six hours uninterrupted at night and naps three times per day for 30 minutes to an hour. (*Id*. at 79-81). Plaintiff can sit

for four hours in an eight-hour workday. (*Id*. at 83). He is unable to lift a gallon of milk for one-third of a workday. (*Id*. at 82).

The ME testified that Plaintiff has CIDP or GBS and acute hepatitis B. (R. at 54–57). The ME opined that Plaintiff's GBS resulting in quadriplegia equaled Listing 11.14 from April 20, 2010, to October 31, 2012. (*Id*. at 59). The ME further opined that from November 1, 2012 to the present, Plaintiff was capable of a limited range of light work. (*Id*. at 59–60). The ME testified that if Plaintiff's claim of intermittent fatigue were accepted, then beginning November 1, 2012, Plaintiff would be able to perform sedentary exertional work except that Plaintiff can never climb ladders, ropes, and scaffolds, occasionally climb ramps and stairs, and frequently use upper extremities, reach in all directions, and perform fine and gross manipulations. (*Id*. at 60). The psychological expert testified that there was not enough information in the record to formulate an opinion concerning a possible cognitive impairment. (*Id*. at 66–68).

The VE testified that Plaintiff's past relevant work as a human resources advisor was performed at the light exertional level. (R. at 88). The ALJ asked the VE to consider an individual of Plaintiff's age, education, and work experience who could perform sedentary work with the following limitations: never climb ladders, ropes, and scaffolds, occasionally climb ramps and stairs, frequently use upper extremities, reach in all directions, and perform fine and gross manipulations, and understand, remember, and carry out at least simple instructions and tasks. (*Id*.). The VE testified that such a person would not be capable of performing Plaintiff's past work

but that the semi-skilled work of a personnel clerk, telephone solicitor, and receptionist and unskilled work of surveillance system monitor, bonder, and charge account clerk would be available. (*Id.* at 89–90). Upon questioning by Plaintiff's attorney, the VE testified that if a person who could sit no more than four hours a day and stand/walk up to two hours a day could not work at least eight hours a day, five days a week for a 40 hour week, there would be no jobs available. (*Id.* at 92).

## V. DISCUSSION

Plaintiff raises four arguments in support of his request for reversal of the ALJ's determination that he is not disabled: (1) the ALJ failed to properly evaluate whether Plaintiff engaged in substantial gainful activity after his alleged onset date, (2) the ALJ's Listing 11.14 equivalency finding is not supported by the record, (3) the ALJ's analysis of Plaintiff's treating physician's opinion was insufficient and resulted in an inaccurate RFC determination, and (4) the ALJ's credibility determination is erroneous. The Court finds that the ALJ committed the second and third errors. Because of these findings, the Court need not address whether the ALJ committed the fourth error.[7]

---

[7] As to Plaintiff's first claim of error, the Court need not address any possible error at step one. The ALJ did not deny Plaintiff's applications at step one of the sequential analysis, but instead proceeded with the remainder of the analysis finding Plaintiff not disabled at step five. Therefore, any error in determining that Plaintiff performed substantial gainful activity after his alleged onset date at step one was inconsequential to the ALJ's ultimate nondisability finding. *Cadenhead v. Astrue*, 2010 WL 5846326, at *13 (N.D. Ill. March 5, 2010) (holding any error the ALJ may have committed at step one "makes no difference . . . because the ALJ continued on in the sequential analysis" and made an alternative finding that the claimant was not disabled at step four).

## A. The ALJ's Step Three Finding that Plaintiff Did Not Equal Listing 11.14 Is Not Supported By Substantial Evidence

Plaintiff argues that the ALJ erred in rejecting the ME's opinion that Plaintiff medically equaled Listing 11.14 because of his CIDP from April 20, 2010 through October 31, 2012. Listing 11.14 applies to peripheral neuropathies "[w]ith disorganization of motor function as described in 11.04B, in spite of prescribed treatment." 20 C.F.R. pt. 404, subpt. P, app.1, § 11.14. Listing 11.04B, cross-referenced in Listing 11.14, requires "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station. The claimant bears the burden of proving his condition meets or equals a listed impairment. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

Plaintiff relies on the opinion of the ME to support his conclusion that he equals Listing 11.14. At the October 23, 2013 hearing, the ME was asked "[i]n your view, for any continuous period of at least 12 months, did his impairments meet or equal in severity the criteria met in the listing of impairments?" (R. at 58). The ME responded yes. (*Id*.). The ME testified that Plaintiff equaled Listing 11.14 as of his alleged onset date of April 20, 2010, through October 31, 2012, which was the last day of physical therapy for active management of Plaintiff's polyneuropathy. (*Id*.). The ME opined that Plaintiff "equal[led] a listing of 11.14 because the Guillain-Barre Syndrome or because of so-called chronic inflammatory demyelinating polyneuropathy resulting in quadriplegia." (*Id*. at 59). The ALJ then asked "[a]nd that was from

AOD (alleged onset date) through October 31st of 2012; is that correct?" (*Id.*). The ME answered yes. (*Id.*).

The ALJ offered three reasons for rejecting the ME's testimony that Listing 11.14 was equaled between April 20, 2010 and October 31, 2012: (1) the ME's opinion was contradicted by "his conclusion that clinical findings in January 2012 supported the conclusion that [Plaintiff] was capable of sedentary work," (2) the record demonstrates that Plaintiff "has improved from a neurological standpoint, and has had normal gait within 12 months of his alleged onset date," and (3) "[e]xaminations in calendar year 2012 have consistently shown a normal gait and station." (*Id.* at 27). For the reasons stated below, the ALJ failed to provide a sufficient explanation as to why he rejected the ME's opinion on Listing 11.14.

First, the ALJ mischaracterized the record when he asserted that the ME's opinion that Plaintiff equaled Listing 11.14 between April 20, 2010 and October 31, 2012 was contradicted by the ME's statement that clinical findings in January 2012 supported the conclusion that claimant was capable of sedentary work. A fair reading of the ME's testimony shows that the ME did not testify that Plaintiff was capable of sedentary work in January 2012. Rather, the ME testified that for the period beginning November 1, 2012, he had two opinions regarding Plaintiff's RFC because of the absence of neurological findings on January 9, 2012, and no mention of specific weakness except for intermittent low back pain on October 2, 2012. (R. at 58-59). The ME explained that based strictly on physical findings in the medical record, Plaintiff would be limited to light physical capacity work beginning November 1,

2012. (*Id.* at 59). The ME further opined that if the ALJ accepted the Plaintiff's symptom of "significant fatigue" as mentioned in an office visit note of January 9, 2012, then Plaintiff would be limited to sedentary capacity work for the period beginning November 1, 2012. (*Id.* at 55, 60). The ME did not testify that Plaintiff was capable of sedentary work in January 2012. Because the ALJ's decision is grounded on a mistake of fact about the ME's testimony, the ALJ failed to build a logical bridge between the record and his first reason for rejecting the ME's opinion that Plaintiff equaled Listing 11.04 between April 20, 2010 and October 21, 2012. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2006) (ALJ must build a logical bridge between the evidence and his conclusion). Remand is therefore required so the ALJ can properly evaluate the ME's testimony in determining whether Plaintiff equaled Listing 11.14. *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) ("A reversal and remand may be required . . . if the ALJ based the decision on serious factual mistakes or omissions.").

The ALJ also erred in other ways at step three. The ALJ paced great weight on a treatment note from July 8, 2011, which indicated that as to gait and station, Plaintiff had erect posture, no postural instability, no festination, and tandem, heel and toe walking were unremarkable. (R. at 27). The ALJ cited this one treatment note to support his determination that Plaintiff had normal gait within 12 months of his alleged onset date. The ALJ did not mention that at Plaintiff's previous visit with Dr. McCoyd on March 9, 2011, Plaintiff had some difficulty with standing on his heels and with tandem walking. (*Id.* at 395). The ALJ also did not note that during

Plaintiff's next visit with Dr. McCoyd on October 7, 2011, Plaintiff still had numbness in his feet, could not run, had some difficulty walking on toes, heels and tandem, still had persistent mostly sensory symptoms (numbness), and did limited walking and had limited strength. (*Id.* at 383–84). By cherry-picking the record to locate a single treatment note that purportedly undermines the ME's assessment, the ALJ overlooked the medical evidence as a whole. *Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("an ALJ must weigh all the evidence and may not ignore evidence that suggest an opposite conclusion"). The ALJ clearly failed to consider the full extent of Plaintiff's deficits regarding gait and station.

The ALJ also did not explain why the one July 8, 2011 treatment note overrode the ME's opinion that Plaintiff equaled Listing 11.14 through October 31, 2012, and the more recent notes and opinions of Dr. McCoyd about Plaintiff's abnormal gait and station. As Dr. McCoyd opined, Plaintiff's impairments likely produce good days and bad days, such that a snapshot of a single moment indicates little about his overall condition. (R. at 1054). If the ALJ suspected that the July 2011 visit pointed toward a greater functional capacity than the ME found to exist, he should have sought clarification from the ME rather than substitute his own lay opinion for the medical opinion of an expert. Thus, the ALJ erred in concluding that Plaintiff's normal gait and station at one appointment on July 8, 2011, undermined the ME's equivalency opinion. On remand, the ALJ shall analyzed whether the ME's equivalency opinion is consistent with Dr. McCoyd's treatment notes as a whole instead of relying on an isolated piece of evidence.

Lastly, the ALJ cited several 2012 examinations, which he stated "have consist-ently shown a normal gait and station." (R. at 27). Once again, the ALJ was selec-tive in his use of evidence. In his step three analysis, the ALJ mentions only the medical evidence favoring the denial of benefits: (1) Dr. Wolfert's April 18, 2012 progress note (incorrectly cited by the ALJ as an examination in May 2012) which indicated that Plaintiff showed normal gait and intact neurological examination;[8] (2) Dr. Langgut's psychological consultative examination report which stated that on March 7, 2012, Plaintiff was slow-moving, unhurried, and ambulated inde-pendently with an unimpaired gait; and (3) a June 1, 2013 emergency room visit re-port for a sore throat which indicated that Plaintiff was ambulatory with a steady gait.[9] (*Id.* at 27, 712, 714, 790, 908).

At step three, the ALJ made no mention of Dr. McCoyd's 2012 notes reporting problems with walking and indicating abnormal gait or station. For example, the ALJ ignored Dr. McCoyd's progress note from January 9, 2012, which noted that Plaintiff reported problems with walking at times, his feet were numb with difficul-ty with temperature sensation, and paresthesias in his feet. (R. at 377). Dr. McCoyd

[8] The ALJ cited to duplicate records of Dr. Wolfert's April 18, 2012 examination. (R. at 27, 790, 835).

[9] The ALJ also cited Dr. McCoyd's June 10, 2013 progress note. (R. at 27). This note con-tains Dr. McCoyd's observation that Plaintiff had some difficulty walking on toes, heels and tandem, which does not support the ALJ's conclusion that Plaintiff had normal gait and station. (*Id.* at 923). The ALJ characterized Dr. McCoyd's June 10, 2013 finding of difficulty walking on heels, toes, and tandem walking as "unexplained." (*Id.* at 27). However, Dr. McCoyd did not state that his gait and station findings were "unexplained." (R. 923). Ra-ther, Dr. McCoyd indicated that Plaintiff's GBS symptoms were "likely chronic/permanent at this time. Still with exertional fatigue." (*Id.*). Moreover, on March 19, 2012, Dr. McCoyd indicated that Plaintiff's ongoing symptoms were likely the result of his underlying neuro-logic condition. (*Id.* at 830).

found that Plaintiff exhibited difficulty walking on toes, heels, and tandem. (*Id.*). The ALJ failed to note Dr. McCoyd's January 20, 2012 statement that Plaintiff's current physical examination findings indicated reduced reflexes and gait dysfunction. (*Id.* at 844). The ALJ did not mention Dr. McCoyd's progress note from March 19, 2012, which indicated Plaintiff reported he was only able to walk a few blocks and developed left extremity pain after walking. (*Id.* at 829). It was again noted that Plaintiff had some difficulty walking on toes, heels and tandem. (*Id.* at 830). The ALJ also failed to mention Dr. McCoyd's progress note on April 30, 2012 which showed that Plaintiff exhibited some difficulty walking on toes, heels and tandem. (*Id.* at 841). The ALJ did not discuss an August 14, 2012 physical therapy evaluation which reflected Plaintiff's gait abnormality and weakness. (*Id.* at 990). The physical therapist noted that Plaintiff's functional limitations included being unable to walk, stand, or sit more than 10–15 minutes without pain or fatigue. (*Id.*).Lastly, as to 2012, the ALJ failed to note that at an August 27, 2012 follow-up appointment with Dr. McCoyd, Plaintiff reported that he still had persistent weakness and could walk only about 50–100 feet. (*Id.* at 856). Dr. McCoyd noted that as to gait and station, Plaintiff had some difficulty walking on toes, heels and tandem. (*Id.* at 858).

These 2012 abnormal assessments of Plaintiff's gait and station by Plaintiff's treating neurologist are significant, and they cannot be ignored. The ALJ was required to address them in his discussion at step three. *Moore*, 743 F.3d at 1124 ("The ALJ simply cannot recite only the evidence that is supportive of her ultimate conclusion without acknowledging and addressing the significant contrary evidence

the in record."); *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999) ("an ALJ may not ignore an entire line of evidence that is contrary to her findings"). The Court finds that the ALJ's selective consideration of the evidence regarding Plaintiff's gait and station presented a skewed version of the evidence and a remand is required for further explanation. *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) (holding an ALJ's failure to consider a relevant line of evidence requires remand). On remand, the ALJ must confront the abnormal gait and station evidence that does not support his step three conclusion and explain why that evidence was rejected.

At step three, the ALJ found that Plaintiff's impairments did not satisfy the criteria of Listing 11.14 is "implicit in all of the opinions from the reviewing medical consultants to the DDS." (R. at 26). "Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004). The ALJ's reliance on the opinions of the state agency physicians is not sufficient to support his step three conclusion. State agency physicians filled out Disability Determination and Transmittal forms at the initial and reconsideration levels, finding that Plaintiff was not disabled. (*Id.* at 116–17, 140–41). While an ALJ is generally entitled to rely on Disability Determination and Transmittal forms indicating that a claimant's condition did not meet or medically equal a Listing, this is only the case if there is "no contradictory evidence in the record." *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006). An "ALJ may rely solely on opinions given in Disability Determination and

Transmittal forms and provide little additional explanation only so long as there is no contradictory evidence in the record." *Id*.

Here, the ME opined that Plaintiff medically equaled Listing 11.14 between April 20, 2010, and October 31, 2012. Given this contradictory evidence in the record, the ALJ could not have relied solely on the state agency physicians' opinions in determining whether Plaintiff's condition medically equals the requirements of Listing 11.14. The state agency physicians did not specifically opine on medical equivalence with regard to Listing 11.14. Neither Dr. Jhaveri nor Dr. Gotanco addressed Listing 11.14 in their Disability Determination Explanation reports. (R. at 96–115, 118–39). Instead, the only Listing indicated under "Adult Listing Considered" is 12.04 (Affective Disorders) by Dr. Terry Travis and Dr. Donald Cochran (*Id*. at 100, 110, 122–23, 133–34). On remand, the ALJ shall obtain and consider expert guidance on whether Plaintiff's impairments medically equal a listed impairment.

## B. The ALJ Failed to Adequately Support His Evaluation of Dr. McCoyd's Opinion

Plaintiff's third contention is that the ALJ failed to provide sufficient reasons for rejecting portions of the opinions of his treating neurologist, Dr. McCoyd. In January 2012, Dr. McCoyd completed a statement for Harford Insurance Company and indicated that "in a general workplace environment," Plaintiff is able to sit 6–8 hours a day, stand 2–4 hours a day and walk 1–2 hours a day. (R. at 843). Dr. McCoyd noted that his physical findings showed "reduced reflexes, gait dysfunction" and Plaintiff was taking 900 mg of Neurontin twice a day. (*Id*. at 844). Dr. McCoyd did not find that Plaintiff could work on a full-time basis for eight hours a day, five

days a week. The ALJ gave the January 2012 opinion of Dr. McCoyd "some weight," noting that Dr. McCoyd attributed his restriction to sedentary activity to subjective symptoms of weakness, fatigue, and imbalance and those symptoms were reported consistently by Plaintiff. (*Id*. at 43).

In August 2013, Dr. McCoyd completed a physical RFC questionnaire and opined that Plaintiff would frequently have pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks, was incapable of even "low stress" jobs, could sit about four hours and stand/walk about two hours in an eight-hour workday, could occasionally lift and carry less than 10 pounds, could rarely lift and carry up to 20 pounds, needed a job that permits shifting positions at will from sitting, standing or walking, needed to take unscheduled breaks during an eight-hour workday, could use his hand and fingers 80% of the workday and arms 50% of the workday, and would have good days and bad days that would result in being absent from work more than four days per month. (R. at 1052–54). Although the ALJ gave "some weight" to Dr. McCoyd's January 2012 opinion, the ALJ did not indicate what weight he assigned to Dr. McCoyd's August 2013 opinion.

The ME testified that Plaintiff can perform sedentary work with some additional restrictions.[10] (R. at 60). The ALJ "adopted" the RFC opinion of the ME because the

---

[10] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledger, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are re-

ME noted "[Plaintiff's] documented complaints of symptoms, severity of the episode of GBS, the significant follow up of [Plaintiff and] the treatment he received." (*Id*. at 40).

Under the treating physician rule, an ALJ must "give controlling weight to the medical opinion of a treating physician if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence.'" *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's condition and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). An ALJ who affords less than controlling weight to the opinion of a treating physician must offer "good reasons" for doing so. 20 C.F.R. § 404.1527(c)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). Those reasons must be "supported by substantial evidence in the record; a contrary opinion of non-examining source does not, by itself, suffice." *Gudgel*, 345 F.3d at 470. "Even if an ALJ gives good reasons for not giving controlling weight to a treating physician's opinion, she has to decide what weight to give that opinion." *Campbell*, 627 F.3d at 308. The applicable regulations provide that the ALJ must consider several factors in determining the weight to give the opinion, including "the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physi-

---

quired occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

cian's opinion." *Id.* (*quoting Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010)); *see also* 20 C.F.R. §§ 404.1527(c); 416.927(c)(d).

Several of these factors suggest that Dr. McCoyd's opinion that Plaintiff could not work full-time should be given substantial weight. Dr. McCoyd treated Plaintiff for more than three years; he treated Plaintiff every couple of months; he is a neurologist; he referred Plaintiff for EMGs and physical therapy and prescribed medications; and his findings remained relatively consistent throughout the course of his treatment.

The ALJ's explanation for why greater weight was given to the ME's opinion over the opinion of Plaintiff's treating neurologist is unpersuasive. In discounting Dr. McCoyd's opinion that Plaintiff could not work a full-time sedentary job, the ALJ noted that: (1) none of Dr. McCoyd's statements included citations to specific findings in support of his conclusions, with the exception of his January 2012 opinion; (2) Dr. McCoyd's treatment notes document Plaintiff's normal gait and station; (3) Dr. McCoyd's June 2013 treatment note fails to justify Dr. McCoyd's August 2013 opinion; and (4) Dr. McCoyd's finding concerning absenteeism is not supported by his records or the records of other treating medical and non-medical sources. (R. at 43). None of these explanations qualifies as a good reason for discounting Dr. McCoyd's opinion in favor of the opinion of the nonexamining ME.

The first reason given by the ALJ for not affording Dr. McCoyd's opinion controlling weight is factually inaccurate. The ALJ stated that none of Dr. McCoyd's statements included citations to specific findings in support of his conclusions ex-

cept his January 2012 statement.[11] (R. at 42). Contrary to the ALJ's statement, Dr. McCoyd's August 2013 physical RFC assessment identified "the clinical findings and objective signs" of Plaintiff's symptoms as "EMG/NCS with evidence of demyelination, elevated CSF protein, and reduced reflexes." (*Id*. at 1051). Because Dr. McCoyd's August 2013 physical RFC assessment cited to specific findings in support of his conclusions, the first reason given by the ALJ for discounting Dr. McCoyd's opinion is not supported by the case record. On remand, if the ALJ believes that Dr. McCoyd's specific findings are insufficient to support Dr. McCoyd's August 2013 opinions, he should explain why.

In discounting Dr. McCoyd's opinion, the ALJ also explained that neurological examinations in Dr. McCoyd's treatment notes document Plaintiff's normal gait and station. (R. at 42). But all but two of the records cited by the ALJ are not Dr. McCoyd's records. (*Id*.). One record cited by the ALJ that is Dr. McCoyd's actually states that as to gait and station, "some difficulty walking on toes, heels and tandem" and that Plaintiff had "sustained distal numbness in his feet and hands." (*Id*. at 923). The one record of Dr. McCoyd's relied on by the ALJ which documented normal gait and station is a July 18, 2011 treatment note. (*Id*. at 806). As discussed above, this one record is in conflict with a significant number of other records from Dr. McCoyd in 2011 and 2012 which report difficulty walking and abnormal gait

---

[11] Dr. McCoyd's January 2012 Attending Physician's Statement indicated that Plaintiff's symptoms included weakness, fatigue, and imbalance and on physical examination, Plaintiff exhibited reduced reflexes and gait dysfunction. (R. at 844).

and station.[12] The ALJ's analysis overlooked this entire line of evidence concerning Plaintiff's abnormal gait and station. Again, the ALJ may not overlook whole lines of evidence or "cherry-pick" facts from the record that support his conclusions while ignoring evidence that points to a disability finding. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). The ALJ's failure to address evidence that demonstrates abnormal gait and station fails to draw a logical bridge between the record and the ALJ's finding that Dr. McCoyd's treatment notes document normal gait and station.

The third reason offered by the ALJ for denying Dr. McCoyd's opinion controlling weight is also flawed. The ALJ stated that the "benign findings" from Dr. McCoyd's June 10, 2013 medical record belied his August 2013 opinion. However, the ALJ failed to explain why Dr. McCoyd's June 2013 findings of sustained distal numbness in hands and feet, mild distal weakness on toe extension, reduced reflexes, some difficulty walking on toes, heels and tandem, and exertional fatigue were "benign," let alone how those findings were inconsistent with Dr. McCoyd's August 30, 2013 opinion regarding Plaintiff's work-related limitations. These June 2013 findings are not clearly inconsistent with Dr. McCoyd's August 2013 disability finding. In fact, Dr. McCoyd's June 2013 statement that Plaintiff's GBS "symptoms are likely chronic/permanent at this time. Still with exertional fatigue" appears to be consistent with his August 2013 listing of Plaintiff's ongoing symptoms as fatigue, weakness,

---

[12] In Dr. McCoyd's final appointment note contained in the record on June 10, 2013, Plaintiff continued to have sustain distal numbness in his feet and hands, mild distal weakness on toe extension, reduced reflexes, and some difficulty walking on toes, heels and tandem. (R. at 923). Dr. McCoyd observed that Plaintiff still suffered exertional fatigue and opined that Plaintiff's CIDP symptoms were likely chronic and permanent. (*Id*.).

imbalance and numbness. (*Id*. at 923, 1051). Without explanation for the finding that Dr. McCoyd's June 2013 treatment note failed to justify his August 2013 opinion, the Court cannot determine that the ALJ's decision to discount Dr. McCoyd's opinion for this reason is supported by substantial evidence. *Clifford*, 227 F.3d at 871 (7th Cir. 2000) (finding that the ALJ's failure to provide any explanation for his belief that the claimant's activities were inconsistent with the treating physician's opinions constituted error). On remand, the ALJ should explain how Dr. McCoyd's June 2013 findings are inconsistent with his August 2013 opinion.

The ALJ's final reason for discounting Dr. McCoyd's opinion is that Dr. McCoyd's findings concerning absenteeism are not supported by either his records or the records of other treating medical and non-medical sources.[13] (R. at 43). "Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence" in the record, but the ALJ must adequately articulate his reasoning for discounting the treating physician's opinion. *Clifford*, 227 F.3d at 871; *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995). Dr. McCoyd opined that Plaintiff's condition is likely to produce good days and bad days, which will cause the Plaintiff to be absent from work more than four days per month. (*Id*. at 1054). Dr. McCoyd's treatment notes from various examinations between 2010 and 2013 are replete with

---

[13] The ALJ also found that Dr. McCoyd's reports concerning Plaintiff's ongoing cognitive and emotional dysfunction are not supported by his own records or the records of other treating medical and non-medical sources. (R. at 43). This finding is supported by substantial evidence in the record. Dr. McCoyd indicated in his January 2012 Statement that Plaintiff does not have a psychiatric/cognitive impairment and in his August 2013 physical RFC questionnaire that emotional factors do not contribute to the severity of Plaintiff's symptoms and functional limitations. (*Id*. at 843, 1052).

reports of fatigue and weakness. Indeed, as the ALJ recognized, Plaintiff's subjective symptoms of weakness, fatigue, and imbalance "*are* reported consistently by [Plaintiff]." (*Id*. at 43) (emphasis in original). The ALJ did not explain why Dr. McCoyd's treatment notes or other source records were inconsistent with his opinion that Plaintiff would be absent from work more than four days per month. The ALJ should have explained why Dr. McCoyd's treatment notes consistently documenting fatigue and weakness were necessarily inconsistent with Dr. McCoyd's finding concerning absenteeism. By failing to do so, the ALJ did not meet his burden of soundly explaining why Dr. McCoyd's opinion was not given controlling weight. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2001).

In light of these errors, the ALJ must reevaluate whether Dr. McCoyd's disability findings are entitled to controlling weight.

## C. Credibility Argument

Because the above-described errors at step three and in evaluating the treating neurologist's opinions mandate a remand, the Court chooses not to address Plaintiff's argument regarding the ALJ's credibility determination. On remand, after determining the weight to be given to the treating neurologist's opinions, the ALJ shall reevaluate Plaintiff's physical RFC, considering all of the evidence of record.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's request for reversal is **GRANTED**, and Defendant's request for affirmance is **DENIED**. Pursuant to sentence four of 42

U.S.C. § 405, the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: May 30, 2017

MARY M. ROWLAND
United States Magistrate Judge